J-S29029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| MARCUS R. JOHNSON | |
| Appellant | No. 2432 EDA 2016 |

Appeal from the Judgment of Sentence dated June 27, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0014428-2014

BEFORE: LAZARUS, J., SOLANO, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED JULY 13, 2017**

Appellant, Marcus R. Johnson, appeals from the judgment of sentence imposed after a jury convicted him of first-degree murder and possessing an instrument of crime (PIC).[1]  We affirm.

The trial court recounted the evidence presented at trial as follows:

> During the summer of 2014, [Appellant] lived at 987 South 5th Street in the City and County of Philadelphia with his longtime paramour, the decedent Nekeisha Eugene, and their nine-year-old son, Marcus Johnson, Jr.  Although [Appellant] and the decedent were romantically involved for the preceding seventeen years, [Appellant] had numerous affairs between 2011 and August 2014.
>
> In 2011, after the decedent discovered that [Appellant] had an affair during a trip to Las Vegas, she moved out of the house for two weeks.  Subsequently, [Appellant], a manager of a

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a) and 907(a).

Walmart, cheated on the decedent with several fellow Walmart employees. In mid-August 2014, the decedent discovered some of these affairs and confronted [Appellant], resulting in numerous arguments.

On September 4, 2014, [Appellant] celebrated his birthday and, despite his promises to remain faithful, he had sex with another woman. Two days later[,] on September 6, 2014, the decedent discovered [Appellant]'s infidelity through text messages sent to his phone and confronted him. During the ensuing argument, the decedent broke [Appellant]'s cell phone, scratched him with a steak knife, and threw a whiskey bottle at him. After the argument, while the decedent was alone in her bedroom, she fired [Appellant]'s .25 caliber Beretta pistol into the bedroom wall.

On September 8, 2014, [Appellant] inserted his own SIM card into the decedent's phone and used it to exchange text messages with several women throughout the day. He later travelled to the Firing Lane gun store in South Philadelphia and attempted to sell his Beretta. After the store owner told [Appellant] that he did not want to purchase the firearm, [Appellant] returned home and placed the Beretta on a computer desk in an upstairs room.

On the evening of September 8, 2014, [Appellant] and his brother, Robert Jackson Jr., were watching Monday Night Football in Jackson's home at 411 Washington Avenue, located across a small parking lot from [Appellant]'s home. At approximately 9:15 p.m., Jackson left his home to drive his wife home from work. At 9:17 p.m., [Appellant] used Jackson's phone to call the decedent, who quickly hung up on him.

Immediately after the phone call, [Appellant] walked home to 987 South 5th Street and confronted the decedent. Upon [Appellant]'s arrival, the decedent revealed that she had seen the text messages [Appellant] sent through her phone, and admonished him because he "keep[s] texting those fucking girls." Despite it being past his bedtime on a school night, [Appellant] immediately ran upstairs and ordered Johnson Jr. to get out of bed and run to Jackson's house. After Johnson Jr. left, the decedent showed [Appellant] a photo she had discovered of him holding an infant he fathered with another

woman. The decedent did not know the baby existed until [Appellant] inadvertently downloaded it onto her phone.

Confronted with this evidence, [Appellant] again ran upstairs, retrieved his .25 caliber Beretta pistol, and returned downstairs to the living room, gun in hand. [Appellant] then slammed the pistol on the TV stand and warned the decedent not to "talk to me like that now," acknowledging the pistol. As the argument continued, [Appellant] grabbed the pistol, pointed it at the decedent, and fired six times.

As the decedent lay bleeding on the living room floor, instead of calling for medical help, [Appellant] called his brother over to 987 South 5th Street. Jackson arrived at [Appellant's] home to discover the decedent lying face up with her eyes twitching, and immediately called 911. Moments later, Police Officers Nicholas Polini, Confesor Nieves, and Martin Berkery arrived at the scene, observed the severity of the decedent's injuries, and immediately transported the decedent in a police van to Jefferson Hospital, where she expired.

As the officers investigated his home, [Appellant] fled and walked to a nearby 7-Eleven convenience store and purchased two containers of NyQuil. [Appellant] ingested the NyQuil in an alleged suicide attempt, but returned to Jackson's home the morning of September 9, 2014, where police arrested him. After his arrest, [Appellant] gave a statement to police wherein he indicated that the decedent held the gun during the argument, that he snatched it from her, and fired between four and five times.

Officer Polini recovered [Appellant]'s Beretta in the living room and discovered six live rounds in the magazine and one in the chamber. Officer Terry Tull of the Crime Scene Unit discovered six Fired Cartridge Casings ("FCCs"), four fired projectiles, and two unfired live rounds in the living room and forwarded them to the ballistics unit. Tull further took three DNA swabs from the handgun and submitted them to the criminalistics laboratory.

Officer Robert Stott, a ballistician with the Philadelphia Firearms Unit and an expert in ballistics identification, inspected the recovered Beretta, the FCCs, and the four projectiles, observed a six right twist identification marker on each

projectile, and determined that each projectile was fired from [Appellant]'s Beretta. Officer Stott further concluded that each of the FCCs were fired from [Appellant]'s firearm. At trial, Officer Stott testified that the Beretta was semi-automatic and in working condition, requiring the shooter to pull the trigger once for each round expended. A shooter would have to apply five-and-one-half pounds of force to pull the trigger of the Beretta, and the recovered firearm had a maximum capacity of nine rounds, indicating that the shooter had reloaded the weapon in the time between the incident and the weapon's recovery.

According to Philadelphia Deputy Medical Examiner Dr. Albert Chu, an expert in forensic pathology, the decedent suffered six distinct gunshot wounds, including two penetrating, fatal wounds to the back of her head, two non-fatal wounds to the left forearm, a non-fatal wound to the right forearm, and a graze wound to the left shoulder. One penetrating, fatal wound to the back of the decedent's head travelled through the victim's skull and brain back to front, left to right, and slightly upward, coming to rest near the decedent's right ear. The decedent's other head wound entered the neck near the base of the skull, fractured the first cervical vertebra, and was recovered on the right side of the decedent's back, near the lower neck. Dr. Chu characterized the second wound as immediately fatal, as the projectile struck the part of the spinal cord that controlled the decedent's breathing and heartbeat. Each of the decedent's wounds was consistent with shots fired while the decedent's back faced the shooter. Dr. Chu concluded, to a reasonable degree of medical certainty, that the manner of death was homicide caused by multiple gunshot wounds.

On September 10, 2014, Jackson recovered [Appellant]'s cell phone from 987 South 5th Street and surrendered it to the police. A Regional Computer Forensic Lab report of the phone revealed several threatening text messages that [Appellant] sent to the decedent in the days leading up to the homicide. Between 11:38 and 11:59 GMT on September 1, 2014, [Appellant] texted the decedent that "you pissed me off so much just now I wanted to choke you," "no, I want to leave because I don't want to be in jail for murder," and "I see how people get angry and stressed enough to kill another."

[Appellant] testified on his own behalf at trial, and claimed that on Saturday, September 6, 2014, the decedent discovered

- 4 -

text messages between [Appellant] and other women on his phone and threatened him with a steak knife. During the argument, the decedent destroyed [Appellant]'s phone, scratched his neck, threw a whiskey bottle at him, and later fired the Beretta into the bedroom wall while he was in another room. In response, [Appellant] attempted to sell the firearm to Ashley Jefferson, Darius Coit, and the Firing Line gun store in the city, but no one was interested in purchasing it.

[Appellant] admitted on the stand that he shot the decedent multiple times after the decedent showed him the photo of him holding a child that he conceived with another woman. [Appellant] testified that after he took the phone from the decedent and attempted to delete the photo, she grabbed the gun and pointed it at him. After a "mild struggle," [Appellant] testified, he wrestled the gun away from the decedent, whereupon the gun discharged, striking and killing her.

Dr. Jonathan Arden, former Chief Medical Examiner of Washington, D.C. and an expert in forensic pathology, testified that the decedent's wounds were consistent with having been caused by five projectiles in a "rapid fire, rapid motion" situation, where the decedent faced [Appellant] when he started shooting and turned around as the bullets struck her. But Dr. Arden, during cross-examination, agreed that the wounds were consistent with the scenario presented by the Commonwealth.

Trial Court Opinion, 9/19/16, at 1-6 (citations to notes of testimony and footnote omitted).

The jury convicted Appellant of first-degree murder and PIC on June 27, 2016. That same day, the trial court sentenced Appellant to mandatory life imprisonment for first-degree murder, with no further penalty for PIC. On June 6, 2016, Appellant filed a post-sentence motion in which he alleged that his conviction was against the weight of the evidence. The trial court

denied the motion on July 18, 2016. Appellant filed a timely appeal on July 25, 2016.

Appellant presents two issues for our review:

1. Did the trial court err in denying Appellant's post-sentence motion because Appellant's conviction is against the weight of the evidence in that the circumstantial evidence was not enough to convict Appellant using the beyond a reasonable doubt standard?

2. Was the evidence insufficient as a matter of law to convict for Murder in the First Degree when there was no specific intent to kill or malice shown?

Appellant's Brief at 4.

The Pennsylvania Supreme Court has delineated the distinctions between Appellant's two claims, stating:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge

- 6 -

must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

***Commonwealth v. Widmer***, 744 A.2d 745, 751-752 (Pa. 2000) (citations, footnote, and quotation marks omitted).

In order to sustain a verdict of first-degree murder, the Commonwealth must prove that a human being was unlawfully killed, that the defendant did the killing; that the killing was willful, deliberate, and premeditated; and that the defendant acted with the specific intent to kill. ***Commonwealth v. Fiebiger***, 810 A.2d 1233, 1235 (Pa. 2002). Instantly, Appellant does not deny that he killed the victim; his contention is that the killing was not first-degree murder.

In challenging the weight of the evidence, Appellant argues that his convictions "shock one's sense of justice" because his "struggle theory of the case was not disproven." Appellant's Brief at 7-10. Appellant also asserts that the verdict was against the weight of the evidence given his introduction of good character evidence. Appellant states that "[i]t is inconceivable that someone of Appellant's good character could engage in the kind of killing alleged by the Commonwealth at trial." ***Id.*** at 11.

With regard to the sufficiency of the evidence, Appellant argues there "was insufficient evidence to sustain Appellant's conviction for first-degree

murder because neither [the] specific intent to kill nor malice were proven beyond a reasonable doubt." *Id.* at 14.

Following our review of the certified record and the parties' briefs, we conclude that the Honorable Barbara A. McDermott, sitting as the trial court, has authored an opinion which correctly addresses and disposes of Appellant's weight and sufficiency issues. *See*, *e.g.*, Trial Court Opinion, 9/19/16, at 10-13 (verdict not contrary to the weight of the evidence based on Appellant's "characterization of events leading up to the shooting" and evidence of good character, where the weight issue was one of credibility that the jury resolved against Appellant) and 8 (evidence was sufficient because "the evidence presented by [Appellant] at trial does not negate the ample evidence of malice and specific intent to kill presented by the Commonwealth").

Based on the foregoing, we adopt the trial court's September 19, 2016 opinion as our own, and hold that the trial court committed neither an error of law nor an abuse of discretion relative to Appellant's evidentiary issues and first-degree murder conviction. The parties shall attach the trial court's opinion to any future filings relating to the merits of this appeal.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/13/2017

# IN THE COURT OF COMMON PLEAS
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :   CP-51-CR-0014428-2014

             : 

       v.          CP-51-CR-0014428-2014 Comm. v. Johnson, Marcus R.
                             Opinion

MARCUS JOHNSON


7500965691

**FILED**

SEP 1 9 2016

         :   Criminal Appeals Unit
First Judicial District of PA

## OPINION

**McDermott, J.**                                                     **September 19, 2016**

### Procedural History

On September 9, 2014, the Defendant, Marcus Johnson, was arrested and charged with Murder and Possession of an Instrument of Crime ("PIC"). On June 20, 2016, the Defendant appeared before this Court and elected to be tried by a jury. On June 27, 2016, the jury returned guilty verdicts to First-Degree Murder and PIC. That same day, this Court imposed the mandatory sentence of life imprisonment without parole for First-Degree Murder.[1]

On July 6, 2016, the Defendant filed a Post-Sentence Motion, which this Court denied on July 18, 2016. On July 25, 2016, the Defendant filed a timely notice of appeal and on September 1, 2016, the Defendant filed a timely Rule 1925(b) statement.

### Facts

During the summer of 2014, the Defendant lived at 987 South 5th Street in the City and County of Philadelphia with his longtime paramour, the decedent Nekeisha Eugene, and their nine-year-old son, Marcus Johnson Jr. Although the Defendant and the decedent were

---

[1] This Court imposed no further penalty for PIC.

0044_Opinion

romantically involved for the preceding seventeen years, the Defendant had numerous affairs between 2011 and August 2014. N.T. 6/23/2016 at 15–21; N.T. 6/24/2016 at 150–154.

In 2011, after the decedent discovered that the Defendant had an affair during a trip to Las Vegas, she moved out of the house for two weeks. Subsequently, the Defendant, a manager of a Walmart, cheated on the decedent with several fellow Walmart employees. In mid-August 2014, the decedent discovered some of these affairs and confronted the Defendant, resulting in numerous arguments. N.T. 6/24/2016 at 41–44, 108, 152.

On September 4, 2014, the Defendant celebrated his birthday and, despite his promises to remain faithful, he had sex with another woman. Two days later on September 6, 2014, the decedent discovered the Defendant's infidelity through text messages sent to his phone and confronted him. During the ensuing argument, the decedent broke the Defendant's cell phone, scratched him with a steak knife, and threw a whisky bottle at him. After the argument, while the decent was alone in her bedroom, she fired the Defendant's .25 caliber Beretta pistol into the bedroom wall. N.T. 6/24/2016 62–78.

On September 8, 2014, the Defendant inserted his own SIM card into the decedent's phone and used it to exchange text messages with several women throughout the day. He later travelled to the Firing Lane gun store in South Philadelphia and attempted to sell his Beretta. After the store owner told the Defendant that he did not want to purchase the firearm, the Defendant returned home and placed the Beretta on a computer desk in an upstairs room. N.T. 6/24/2016 at 95–96, 103.

On the evening of September 8, 2014, the Defendant and his brother, Robert Jackson Jr., were watching Monday Night Football in Jackson's home at 411 Washington Avenue, located across a small parking lot from the Defendant's home. At approximately 9:15 p.m., Jackson left

his home to drive his wife home from work. At 9:17 p.m., the Defendant used Jackson's phone to call the decedent, who quickly hung up on him. N.T. 6/22/2016 at 5–14; 6/24/2016 at 100–102.

Immediately after the phone call, the Defendant walked home to 987 South 5th Street and confronted the decedent. Upon the Defendant's arrival, the decedent revealed that she had seen the text messages the Defendant sent through her phone, and admonished him because he "keep[s] texting those fucking girls." Despite it being past his bedtime on a school night, the Defendant immediately ran upstairs and ordered Johnson Jr. to get out of bed and run to Jackson's house. After Johnson Jr. left, the decedent showed the Defendant a photo she discovered of him holding an infant he fathered with another woman. The decedent did not know the baby existed until the Defendant inadvertently downloaded it onto her phone. N.T. 6/22/2016 at 202 –211; N.T. 6/24/2016 at 103 –104, 108

Confronted with this evidence, the Defendant again ran upstairs, retrieved his .25 caliber Beretta pistol, and returned downstairs to the living room, gun in hand. The Defendant then slammed the pistol on the TV stand and warned the decedent not to "talk to me like that now," acknowledging the pistol. As the argument continued, the Defendant grabbed the pistol, pointed it at the decedent, and fired six times. N.T. 6/22/2016 at 30–31, 147–150; N.T. 6/24/2016 at 188.

As the decedent lay bleeding on the living room floor, instead of calling for medical help, the Defendant called his brother over to 987 South 5th Street. Jackson arrived at the Defendant's home to discover the decedent lying face up with her eyes twitching, and immediately called 911. Moments later, Philadelphia Police Officers Nicholas Polini, Confesor Nieves, and Martin Berkery arrived at the scene, observed the severity of the decedent's injuries, and immediately

3

transported the decedent in a police van to Jefferson Hospital, where she expired. N.T. 6/21/2016 at 55–58, 69–70, 74–84, 253–255; N.T. 6/22/2016 at 15–21

As the officers investigated his home, the Defendant fled and walked to a nearby 7-Eleven convenience store and purchased two containers of NyQuil. The Defendant ingested the NyQuil in an alleged suicide attempt, but returned to Jackson's home the morning of September 9, 2014, where police arrested him. After his arrest, the Defendant gave a statement to police wherein he indicated that the decedent held the gun during the argument, that he snatched it from her, and fired between four and five times. N.T. 6/22/2016 at 32–34; N.T. 6/24/2016 at 246–251; Commonwealth Exhibit C-24.

Officer Polini recovered the Defendant's Beretta in the living room and discovered six live rounds in the magazine and one in the chamber. Officer Terry Tull of the Crime Scene Unit discovered six Fired Cartridge Casings ("FCCs"), four fired projectiles, and two unfired live rounds in the living room and forwarded them to the ballistics unit. Tull further took three DNA swabs from the handgun and submitted them to the criminalistics laboratory.[2] N.T. 6/21/2016 60–70; 111–129; N.T. 6/22/2016 at 147–150.

Officer Robert Stott, a ballistician with the Philadelphia Firearms Unit and an expert in ballistics identification, inspected the recovered Beretta, the FCCs, and the four projectiles, observed a six right twist identification marker on each projectile, and determined that each projectile was fired from the Defendant's Beretta. Officer Stott further concluded that each of the FCCs were fired from the Defendant's firearm. At trial, Officer Stott testified that the Beretta was semi-automatic and in working condition, requiring the shooter to pull the trigger once for each round expended. A shooter would have to apply five-and-one-half pounds of force

---

[2] Although the DNA evidence indicated a mixture of at least two individuals on the handgun, the evidence with respect to the Defendant or decedent was inconclusive. N.T. 6/23/2016 at 300–307.

4

to pull the trigger of the Beretta, and that the recovered firearm had a maximum capacity of nine rounds, indicating that the shooter had reloaded the weapon in the time between the incident and the weapon's recovery. N.T. 6/22/2016 at 115–152.

According to Philadelphia Deputy Medical Examiner Dr. Albert Chu, an expert in forensic pathology, the decedent suffered six distinct gunshot wounds, including two penetrating, fatal wounds to the back of her head, two non-fatal wounds to the left forearm, a non-fatal wound to the right forearm, and a graze wound to the left shoulder. One penetrating, fatal wound to the back of the decedent's head travelled through the victim's skull and brain back to front, left to right, and slightly upward, coming to rest near the decedent's right ear. The decedent's other head wound entered the neck near the base of the skull, fractured the first cervical vertebra, and was recovered on the right side of the decedent's back, near the lower neck. Dr. Chu characterized the second wound as immediately fatal, as the projectile struck the part of the spinal cord that controlled the decedent's breathing and heartbeat. Each of the decedent's wounds was consistent with shots fired while the decedent's back faced the shooter. Dr. Chu concluded, to a reasonable degree of medical certainty, that the manner of death was homicide caused by multiple gunshot wounds. N.T. 6/21/2016 at 175–217.

On September 10, 2014, Jackson recovered the decedent's cell phone from 987 South 5th Street and surrendered it to the police. A Regional Computer Forensic Lab report of the phone revealed several threatening text messages that the Defendant sent to the decedent in the days leading up to the homicide. Between 11:38 and 11:59 GMT on September 1, 2014, the Defendant texted the decedent that "you pissed me off so much just now I wanted to choke you," "no, I want to leave because I don't want to be in jail for murder," and "I see how people get angry and stressed enough to kill another." N.T. 6/23/2016 at 22–30.

5

The Defendant testified on his own behalf at trial, and claimed that on Saturday, September 6, 2014, the decedent discovered text messages between the Defendant and other women on his phone and threatened him with a steak knife. During the argument, the decedent destroyed the Defendant's phone, scratched his neck, threw a whisky bottle at him, and later fired the Beretta into the bedroom wall while he was in another room. In response, the Defendant attempted to sell the firearm to Ashley Jefferson, Darius Coit, and the Firing Line gun store in the city, but no one was interested in purchasing it. N.T. 6/24/2016 at 66–78, 88, 95–96.

The Defendant admitted on the stand that he shot the decedent multiple times after the decedent showed him the photo of him holding a child that he conceived with another woman. The Defendant testified that after he took the phone from the decedent and attempted to delete the photo, she grabbed the gun and pointed it at him. After a "mild struggle," the Defendant testified, he wrestled the gun away from the decedent, whereupon the gun discharged, striking and killing her. N.T. 6/24/2016 at 71–98, 109–110.

Dr. Jonathan Arden, former Chief Medical Examiner of Washington D.C. and an expert in forensic pathology, testified that the decedent's wounds were consistent with having been caused by five projectiles in a "rapid fire, rapid motion" situation, where the decedent faced the Defendant when he started shooting and turned around as the bullets struck her. But Dr. Arden, during cross-examination, agreed that the wounds were consistent with the scenario presented by the Commonwealth. N.T. 6/23/2016 at 123–130, 140–145, 187–200, 218–234, 265–266; N.T. 6/24/2016 at 14–20.

**Discussion**

The Defendant challenges the sufficiency and weight of the evidence supporting his convictions. Evidence is sufficient to sustain a conviction when, viewed in the light most

favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences drawn therefrom support the jury's finding of all the elements of an offense beyond a reasonable doubt. *Commonwealth v. Mattison*, 82 A.3d 386, 392 (Pa. 2013) (*citing Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008)). In applying this standard, Pennsylvania courts acknowledge that "the Commonwealth may sustain its burden by means of wholly circumstantial evidence." *Montalvo*, 956 A.2d at 932 (*citing Commonwealth v. Diggs*, 949 A.2d 873, 877 (Pa. 2008)). The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence, as any doubts regarding a defendant's guilt may be resolved by the fact finder unless the evidence is so inconclusive that, as a matter of law, no probability of guilt may be drawn. *Commonwealth v. Devine*, 26 A.3d 1139, 1145 (Pa. Super. 2011) (*quoting Commonwealth v. Jones*, 874 A.2d 108, 120–121 (Pa. Super. 2005)). The fact finder is free to believe all, part, or none of the evidence. *Id.*

First Degree Murder is any unlawful killing committed with malice and the specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Johnson*, 615 Pa. 354, 42 A.3d 1017, 1025 (2012). Evidence is sufficient to sustain a First-Degree Murder conviction if the Commonwealth established, beyond a reasonable doubt, that (1) a person was unlawfully killed; (2) the defendant killed the person; and (3) the defendant acted with a specific intent to kill. *Commonwealth v. Buford*, 101 A.3d 1182, 1186 (Pa. Super. 2014) (*citing Commonwealth v. Ramos*, 827 A.2d 1195, 1196 (Pa. 2003)). An intentional killing is a "willful, deliberate, and premeditated killing." 18 Pa.C.S. § 2502(d). Malice and the specific intent to kill may both be inferred from a defendant's use of a weapon on a vital part of the victim's body. *Buford*, 101 A.2d at 1186; *Commonwealth v. Thomas*, 54 A.3d 332, 335-36 (Pa. 2012). The Commonwealth may establish that a defendant intentionally killed the victim wholly through circumstantial evidence.

7

*Commonwealth v. Chambers*, 980 A.2d 35, 44 (Pa. 2009) (*citing Commonwealth v. Rivera*, 773 A.2d 131, 135 (Pa. 2001)).

The Defendant argues that the evidence he presented of prior mutual physical arguments between himself and the decedent preclude the fact-finder from concluding that the Defendant acted with malice and the specific intent to kill. At trial, the Defendant testified that on the night of the shooting, the decedent pointed the loaded Beretta at him before he wrestled it away and fired it at her. The Defendant further argues that his attempts to sell the weapon after the confrontation between him and the decedent on September 6, 2014 demonstrates that he acted absent malice and the specific intent to kill.

The evidence presented by the Defendant at trial does not negate the ample evidence of malice and specific intent to kill presented by the Commonwealth. In the week prior to the shooting, the Defendant sent the decedent numerous threatening text messages, which the Defendant attempted to explain away as mere jokes. N.T. 6/23/2016 at 28–30; N.T. 6/24/2016 at 145–146. On the evening of the shooting, the Defendant escalated a verbal altercation into a deadly confrontation by introducing his firearm into a domestic argument. After the decedent admonished the Defendant for his string of infidelities, the Defendant stopped arguing with the decedent, went upstairs and armed himself, returned to the decedent brandishing a weapon, and threatened her. On the witness stand, the Defendant himself admitted that he threatened the decedent by saying "talk to me like that now" with a weapon nearby. N.T. 6/24/2016 at 188.

The Defendant shot the decedent six times, and both Dr. Chu and Dr. Arden concluded that the decedent was killed by two bullets to the back of her head, a vital body part. N.T. 6/21/2016 at 190–191, 201–205; N.T. 6/23/2016 at 266–267; *see Buford, supra* (malice and specific intent to kill may both be inferred from a defendant's use of a weapon on a vital body

8

part.). Even if the decedent had been the initial aggressor, the Defendant wrestled the firearm from her and was no longer in danger at the time of the shooting. In both his statement to police and his testimony on the witness stand, the Defendant admitted that he fired the shots that killed the decedent after gaining possession of the gun. N.T. 6/24/2016 at 37; Commonwealth Exhibit C-24. The Beretta's trigger required the Defendant to apply five-and-one-half pounds of force to fire each round. The Defendant made a conscious and deliberate decision to fire each shot at the decedent. N.T. 6/22/2016 at 138, 141–143. This evidence is sufficient to support the jury's verdict.

An argument that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence. *Commonwealth v. Davis*, 799 A.2d 860, 865 (Pa. Super. 2002). An allegation that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial court. *Commonwealth v. Dupre*, 866 A.2d 1089, 1101 (Pa. Super. 2005) (citing *Commonwealth v. Sullivan*, 820 A.2d 795, 805–806 (Pa. Super. 2003); *Commonwealth v. Widmer*, 744 A.2d 745, 751–752 (Pa. 2000). "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror." *Commonwealth v. Bruce*, 916 A.2d 657, 665 (Pa. Super. 2007) (*citing Commonwealth v. Widmer*, 744 A.2d 745 (Pa. 2000)).

For weight of the evidence claims, the Supreme Court has explained that the test is whether the verdict must be so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Diggs*, 949 A.2d 873, 879-80 (Pa. 2008). Since the finder of fact is free to

9

believe all, part, or none of the evidence and to determine the credibility of the witnesses, for a defendant to prevail on a challenge of the weight, the evidence must be "so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003). An appellate court cannot substitute its judgment for that of the finder of fact. *Commonwealth v. Morris*, 958 A.2d 569, 577 (Pa. Super. 2008) (*citing Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003)). A weight of the evidence challenge is one of the least assailable reasons for granting or denying a trial. *Commonwealth v. Horne*, 89 A.3d 277, 285 (Pa. Super. 2014) (*citing Widmer*, 744 A.2d at 753).

The Defendant challenges the weight of the evidence supporting his conviction on the basis that Dr. Arden's testimony supported the Defendant's version of the events leading up to and during the shooting, that he consistently testified concerning his version of events, and because extensive testimony supported his character for non-violence.

Dr. Arden's "rapid fire, rapid movement" scenario, as presented at trial, was unbelievable. To support his theory, Dr. Arden testified that the wound to the base of the decedent's skull first grazed the decedent's shoulder before penetration. N.T. 6/23/2016 at 218–223. This wound, Dr. Arden claimed, was consistent with the decedent facing the Defendant when he started to fire, and turning away as the projectiles struck her, lending credence to the Defendant's self-defense claim. *Id.* at 224–234. At trial, Dr. Arden demonstrated that a single bullet could strike both the shoulder and the base of the decedent's skull if the decedent contorted her shoulder behind her neck in an unnatural manner as the bullet struck her.

The jury's rejection of Dr. Arden's theory does not shock this Court's conscience. The Commonwealth impeached Dr. Arden's credibility revealing that, during his time as Washington D.C.'s Chief Medical Examiner, the Medical Examiner's office lost its accreditation and Dr.

10

Arden was forced to resign in disgrace. N.T. 6/23/2016 at 200 –209. Dr. Chu considered a scenario similar to Dr. Arden's and concluded that the decedent's body would have to be contorted in a position so unnatural that the scenario was unlikely. N.T. 6/21/2016 at 207. Dr. Chu further concluded that the shape of the entrance wound to the base of the decedent's skull was inconsistent with a projectile having previously struck another body part. *Id.* at 208. Finally, both the Commonwealth and Dr. Arden agreed that the additional head wound, fired from the rear of the decedent and entering the left side of the decedent's skull, also caused her death. *Id.* at 201–204, 6/23/2016 at 255–256.

The mere fact that the Defendant's testimony was consistent is insufficient to support his weight of the evidence claim. The Defendant's characterization of the events leading up to the shooting changed from the time of his police statement in September 2014 to his testimony in June 2016. In his original police statement, the Defendant stated that he shot the decedent four or five times, and that he snatched the gun from the decedent as she pointed it at him. At trial, the Defendant testified that he heard only one shot, did not recall firing five or six shots, and he characterized taking possession of the gun from the decedent as a "mild struggle." This testimony is self-serving, elicited only to support the Defendant's self-defense claim. The jury heard the Defendant's extensive direct and cross examination and, as the fact finder, was free to believe all, part, or none of his testimony. *See Sullivan, supra.* The jury further heard evidence that the Defendant threatened the decedent multiple times in the week leading up to the murder, that the Defendant had to pull the trigger six times to fire six bullets, that two projectiles struck the back of the decedent's head, and that the wounds were consistent with the Defendant standing behind the decedent as he shot her. The evidence presented was neither vague, tenuous, nor uncertain.

11

The Defendant suggests that the evidence of his good reputation in the community being a peaceful and law-abiding person renders the jury's verdict as against the weight of the evidence. "Evidence of good character is always admissible for the defendant in a criminal case. It is to be weighed and considered in connection with all the other evidence in the cause. It may of itself, in some instances, create the reasonable doubt which would entitle the accused to an acquittal." *Commonwealth v. Sandusky*, 77 A.3d 663, 673 (Pa. Super. 2013) (*citing Commonwealth v. Cleary*, 19 A. 1017, 1018 (Pa. 1890)). While a jury may reach a verdict on character evidence alone, character evidence is to be weighed and considered with all other evidence in the case. *Id* at 673–674. (*citing Commonwealth v. Padden*, 50 A.2d 722 (Pa. Super. 1947); *Commonwealth v. Khamphouseane*, 642 A.2d 490, 496 (Pa. Super. 1994)). The Defendant is entitled to a jury instruction that fully and correctly appraises the jury of the manner in which it could consider the Defendant's evidence of good character. *Id.* at 674 (*citing Khamphouseane*, 642 A.2d at 496).

Evidence of a defendant's good character does not guarantee an acquittal. In *Commonwealth v. Montalvo*, 986 A.2d 84 (Pa. 2009), the defendant murdered his wife and her co-worker during a home invasion. At trial, the defendant called two character witnesses, who testified to his law-abiding reputation. *Id* at 90. The trial court properly instructed the jury that evidence of good character may raise an inference of reasonable doubt requiring a not guilty verdict. *Id.* at 97. After deliberation, the jury returned two guilty verdicts to First Degree Murder.

The Defendant presented the testimony of his friends Darius Coit, Idris Best, his grandmother Mattie Waters, his mother Charlotte Johnson, and his sisters Sami Johnson and Robin Jackson all of whom testified that the Defendant had an excellent reputation as a peaceful

and law-abiding citizen. N.T. 6/23/2016 at 141, 172–187; N.T. 6/24/2016 at 6. During cross examination of Coit and Waters, the Commonwealth elicited that they had not spoken to several of the Defendant and decedent's mutual friends and family members concerning the Defendant's reputation. N.T. 6/23/2016 at 146 –149, 175. The Commonwealth further presented Melinda Greene, the decedent's sister, who testified that the Defendant did not carry a reputation as a law abiding and peaceful individual. N.T. 6/24/2016 at 264.

This Court properly instructed the jury to consider evidence of the Defendant's good character with all of the other evidence presented in this case. While this Court instructed the jury that they may acquit the Defendant on character evidence alone, the jury in this case chose not to. N.T. 6/27/2016 at 130–131. The jury's decision does not shock this Court's conscience

For the foregoing reasons, the decision of this Court should be affirmed.

BY THE COURT,

Barbara A. McDermott, J.

13

**Commonwealth v. Marcus Johnson, CP-51-CR-0014428-2014**

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing filing upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa. R. Crim. P. 114:

> Philadelphia District Attorney's Office
> Three South Penn Square
> Philadelphia, PA 19107
> Attn: Hugh Burns, Esquire

**Type of Service:**      **DA's Courthouse Assigned Box**

> Stephen T. O'Hanlon, Esq.
> Two Penn Center
> 1500 John F. Kennedy Boulevard
> Suite 1850
> Philadelphia, PA 19102

**Type of Service:**      **First Class Mail**

> Marcus Johnson
> MP 1756
> SCI Forest
> Box 945
> Marienville, PA 16239

**Type of Service:**      **Certified Mail**

Dated: September 19, 2016

**Joseph Duffy**
**Law Clerk to the**
**Honorable Barbara A. McDermott**